IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| LONNIE ENCALADE | § | |
| v. | § | CIVIL ACTION NO. 9:04cv142 |
| G. WAKEFIELD, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

  The Plaintiff Lonnie Encalade, an inmate confined in the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil action under 42 U.S.C. §1983 complaining of alleged violations of his civil rights during his confinement in the prison. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

  An evidentiary hearing was conducted on September 23, 2004, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing, Encalade testified concerning his claim that he was subjected to cruel and unusual punishment on May 28, 2004, while working in the field at the Eastham Unit. The parties consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding; the lawsuit was subsequently transferred to the docket of the undersigned United States Magistrate Judge for entry of final judgment in accordance with the consent of the parties. 28 U.S.C. §636(c).

  Following the hearing, the Defendant Sgt. Neal Smith was ordered to answer the lawsuit. After Sgt. Smith filed his answer, the lawsuit was scheduled for a trial before the Court. The parties were notified that they could call and cross-examine witnesses and introduce documentary and other evidence in support of their respective contentions. The trial before the Court was conducted without objection on June 22, 2005.

1

At trial, Encalade testified that he suffered from high blood pressure and was assigned to work in a medical squad. On May 28, 2004, his squad was called out to work in the field. His squad was assigned to pick peas. After working about 30 minutes or so, Encalade said, he began to feel dizzy. He passed out, and when he woke up, Sgt. Smith was on horseback over him. Smith said that he would not call a doctor or get medical help for Encalade. A support services inmate came with some water and tried to give Encalade some, but Sgt. Smith said that Encalade was not to get any water.

Instead, Encalade said, Sgt. Smith ordered him to go out and sit in the middle of the field, in the sun. Around 9:30 or 10:00 a.m., Encalade said that it began to get hot. He passed out again, and woke up with his face dirty and with bugs on him. Sgt. Smith ordered him to get up, but when he could not, Smith ordered an inmate named Lacy to come pick him up. Encalade stated that Lacy took him to the trailer that the inmates rode on to get to the field, but that on the way, he stopped off and got some water.

Encalade said that he came into the building with the other inmates. When they came in the gate, he asked an officer named Due to call for a doctor, but Due said that he had to shower all of the inmates in the field squad. Encalade was in the last group of inmates taken to shower and the last group of inmates taken to lunch. After lunch, he was finally able to go to the infirmary.

Once he arrived at the infirmary, Encalade said, his pressure and oxygen levels were checked and he was put on oxygen. A doctor told him that he was dehydrated and told him to take his medications and to drink more fluids. He also got a medical lay-in for a few days. He was allowed to return to his cell but no investigation was done; Encalade noted that he did not receive a disciplinary case that day even though he did not work.

On cross-examination, Encalade reiterated that when he was first offered water, Sgt. Smith ordered that he not get any. He said that he could not get water later in the day because he had been ordered to sit in the field, and if he got up, even to get water, the officers would have thought that he was trying to escape.

On another occasion, Encalade said, a white inmate had passed out, and Major Harris drove out with some nurses and picked the inmate up. He said that he should have been treated this way as well. He said that in the infirmary, he was told that his oxygen level was 60, and said that he was dehydrated because he did not get any water.

Major Todd Harris testified that he did not recall this specific incident because he was not working in the field that day. He said that no one called him about Encalade passing out in the field. Major Harris explained that by policy, if an inmate gets sick or otherwise requires medical care, the field supervisor is supposed to see that he gets it.

Major Harris explained that all TDCJ-CID officers get hot weather training every year, which teaches about heat exhaustion and such matters. He said that there are different categories of heat with which the supervisors determine how much the field squads work. Major Harris stated again that the officers were trained and should be able to recognize symptoms of heat-related distress, and that the medical staff would be called if an inmate was in fact in distress.

Under the facts of the case as told to him, Major Harris said, he did not believe that Smith had done anything wrong. He said that according to his information, Smith did offer Encalade water, and Encalade stayed with his squad during the day, moving as they moved. He acknowledged that if Encalade's version of the story was correct, Smith had acted improperly. However, Major Harris said that no investigation was done because the facts did not warrant one.

The next witness called was Nurse Wright. The nurse testified that when Encalade was seen in the clinic, his blood pressure was measured at 170/95, which she said was "a little high," but that this depended on the circumstances. She stated that high blood pressure did not keep inmates from being assigned to work in the field. Nurse Wright also said that Encalade's oxygen level was measured at 88, slightly below the normal range of 92-100; she stated that this could be caused by hyperventilating or shallow breathing. Nurse Wright said that Encalade's blood pressure and oxygen level were not conditions which would require emergency treatment, and noted that he was not given an IV nor kept in the infirmary.

If an inmate became sick in the field, Nurse Wright said, whether or not medical care was required depends on the circumstances. Sometimes an inmate can just sit and rest, and that would be sufficient. She stated that it is wrong to deny inmates water or medical care.

Nurse Wright added that dehydration can be caused in part by the high blood pressure medications which Encalade was taking. She said that Encalade saw a nurse and a physician's assistant at the clinic, and the physician's assistant told him to drink more fluids. After Encalade was released, no further treatment was given and there were no follow-up visits related to this incident. Nurse Wright also said that Encalade was not given a pass from work because a three-day weekend was coming up, when the squad would not have to work.

Officer Lee Due testified that he recalled the incident of May 28, 2004. Officer Due said that the squads turned out and Encalade never said that he was sick. There was a 45-minute ride to the worksite, and Sgt. Smith told the squads where to start work. About five minutes after his squad got off the trailer, Due said, Encalade fell out. Due saw Encalade laying on the ground and told Sgt. Smith, and Smith went over and checked him. Due stated that Smith found nothing wrong with Encalade.

Officer Due said that Encalade was given water on two occasions, but then refused any more. He noted that another inmate helped Encalade get to the trailer, but that Encalade walked by himself to the building, and then to the shower and to the dining hall. After lunch, Due took him to the infirmary. He stated that Encalade never requested medical care while in the field.

Due also said that he did not help Encalade at first because he had a weapon, and so he was not supposed to approach inmates too closely. He said that Encalade sat on the ground, but moved along with his squad. He said that he did not deny Encalade medical care when they first came in the building.

During the workday, Due said, the squads worked for 45 minutes and then rested for 15, during which they got water. He said that Encalade received water the first two times that the water truck came around, but then refused to drink any more.

The defendant, Sgt. Neal Smith, testified that Encalade's work squad was called out at 6:00 a.m. that morning. He said that when the squads assemble for work, inmates have the chance to notify officers of any problems which they are having, so the officers can see if a medical lay-in is necessary. There were no complaints, so he took the squads to work.

Smith said that Officer Due was in charge of 15 Squad, in which Encalade worked. He said that while he was taking inmates in another squad off the trailer, he heard a commotion. Officer Due said that they "had one down." Smith said that he finished taking the last squad off the trailer and went to see. Smith asked Encalade what was wrong and Encalade said that he was "dizzy." Smith saw no symptoms of heat-related problems such as sweating, so he told Encalade to sit down and see if it got better.

Smith testified that Encalade never showed any symptoms of heat-related distress, and never asked for medical care. He said that Encalade never complained about chest pain or that he was about to pass out, and that had he done so, Smith would have taken him to the medical department. Smith noted that in the past, he had poured ice water on inmates or packed them in towels when they suffered heat-related ailments.

Smith said that he did not treat inmates any differently because of their race. He denied telling the support service inmate not to give Encalade water, saying that in fact, he was telling the inmate not to give him - Smith - any water. He said that he did not call the medical department because there was nothing apparently wrong with Encalade and Encalade did not ask that the medical department be called. He denied laughing at Encalade or threatening him with placement in segregation. Instead, Smith said, the only conversation he had with Encalade was when he asked Encalade what was wrong, and Encalade said that he was dizzy. When he returned, Smith said, Encalade refused to talk to him. At this time, Smith said, he ordered Encalade to keep up with his squad, but did not make him go sit in the middle of the field.

Smith noted that he had worked at the prison for over 25 years, and had spent virtually all this time as a field officer. He said that he could recognize heat-related ailments and that Encalade

5

showed no signs of any of these. He said that from what he observed, Encalade did not require immediate medical attention, and said that he never denied Encalade water.

## Legal Standards and Analysis

The Fifth Circuit has held that requiring inmates to spend the night in an open field, without adequate protective clothing or access to hygienic necessities, could violate the Eighth Amendment. Palmer v. Johnson, 193 F.3d 346, 353-54 (5th Cir. 1999). In this case, Encalade's allegations of being denied water and medical care could, if proven, set out a constitutional claim. The testimony of the Defendant and of Officer Due, on the other hand, tended to show that the Plaintiff was not subjected to cruel or unusual punishment. However, as the Plaintiff in the lawsuit, Encalade must prove his allegations by a preponderance of the evidence in order to prevail.

The law provides that in a civil action, the Plaintiff has the burden of proof to establish issues of fact by a preponderance of the evidence. Vogel v. American Warranty Home Service Corp., 695 F.2d 877, 882 (5th Cir. 1983). A "preponderance of the evidence" means the greater weight of the evidence; it is that evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate. If, upon any issue in the case, the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then the Plaintiff has not met his burden of proof. Smith v. United States, 726 F.2d 428, 430 (8th Cir. 1984).

In this case, the contentions of the Plaintiff were directly contradicted by the testimony of the Defendant and his witnesses. While I did not find the Plaintiff's testimony to be wholly incredible or unbelievable, neither did I find that his testimony had more convincing force or greater weight than that of the Defendant or the witnesses called. Instead, I found the evidence offered by the parties to be equally balanced, not weighing more heavily on either side. Thus, I must conclude as a matter of law that the Plaintiff has failed to meet his burden of proof and that judgment should be entered for the Defendant. See Green v. Carsaydo, slip op. no. 93-5466 (5th Cir., June 30, 1994) (unpublished) (upholding dismissal of lawsuit where prisoner plaintiff failed to carry burden of proof, and observing that the Fifth Circuit is "most reluctant" to disturb the credibility assessments

made by the district court as trier of fact); *accord*, Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 375 (5th Cir. 2000) (appellate court "cannot second-guess the district court's decision to believe one witness' testimony over another's or to discount a witness' testimony.") It is accordingly

ORDERED that judgment be and hereby is entered, that the Plaintiff Lonnie Encalade shall take nothing on his lawsuit from the Defendant Sgt. Neal Smith.  Rules 52(a) and 58, Fed. R. Civ. P.  It is further

ORDERED that the above-styled civil rights lawsuit is hereby DISMISSED with prejudice.  It is further

ORDERED that all motions filed by any party which may be pending in this action are hereby DENIED.  All parties shall bear their own costs.

So **ORDERED** and **SIGNED** this **23** day of **June, 2005.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE